United States District Court
Southern District of Texas
**ENTERED**
October 05, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. H-21-103-1 |
| | § | |
| MOHAMED M. MOKBEL | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION, AND ORDER**

Mohamed Mokbel has been indicted for using pharmacies that he owned and operated to defraud Medicare, Medicaid, and commercial insurance companies by submitting fraudulent reimbursement claims for medications and medical supplies to treat diabetes.  The indictment alleges that Mokbel used 4M Pharmacies, which he owned and operated, to submit reimbursement claims for prescription payments through the pharmacy benefit managers responsible for processing claims for Medicare and Medicaid and other insurance providers.  The indictment alleges that from 2013 to 2020, Mokbel's 4M Pharmacies billed Medicare and Medicaid and other insurance providers for prescriptions and supplies to treat diabetes that the pharmacies did not provide patients, or that no doctor had prescribed, or that no patient consented to receive, or for which no co-pay was collected.  (Docket Entry No. 1, Counts 1–4).  The indictment also charges Mokbel with laundering the proceeds of the alleged health care fraud.  (*Id.*, Counts 5–8).

After the grand jury indictment issued, federal agents executed a court-issued warrant to search Mokbel's home.  Mokbel moves to suppress the evidence from the search on the grounds that the warrant did not meet Fourth Amendment particularity requirements and that the good-faith

exception does not apply.  (Docket Entry No. 33).   The government responded, and Mokbel replied.  (Docket Entry. Nos. 38, 42).

Mokbel also moves for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine if the government's seizure of funds that Mokbel claims as his, held in 4M bank accounts, violated the Fourth Amendment—a determination that would require the court to order the government to return Mokbel's money.  (Docket Entry No. 39).  The government responded, and Mokbel replied.  (Docket Entry Nos. 48, 49).  The government also cross-moved to maintain and preserve the seized funds, and Mokbel responded to that motion.  (Docket Entry Nos. 41, 43). The court heard arguments and asked for supplemental briefing on the return-of-money motions, which the parties provided.  (Docket Entry Nos. 57, 59).

Based on the motions and responses, the record, the arguments of counsel, and the applicable law, the court concludes that the warrant for records in Mokbel's home raises problems with the Fourth Amendment's particularity requirement and requires factual determinations on the good-faith exception that justify a suppression hearing.  That hearing will also allow the court a full basis to consider and reliably rule on Mokbel's arguments that the affidavit supporting the seizure of account funds contained material omissions.  The reasons for having a suppression and *Franks* hearing are explained in more detail below.

I.    **Suppression**

   A.    **The Warrant To Search Mokbel's Home and Seize Records and Property**

In March 2021, the Southern District of Texas approved a warrant to search Mokbel's home.  Attachment A described the premises to be searched:  Mokbel's home.  (Docket Entry No. 33-1 at 2).  Attachment B described the items to be seized:  "All records" within the home "in any form relating to violations" under the U.S. Code for wire fraud, health care fraud, money

2

laundering, and stolen property.  (*Id.* at 3 (citing 18 U.S.C. §§ 1343, 1347, 1957, 2314, 2315)).
The warrant stated that this "includ[ed]" the following 14 categories of documents:

- "Any and all records pertaining to business, financial, and other financial records";

- "Any and all personal records";

- "Records pertaining to assets and liabilities";

- "Business cards";

- "Records relating to the rental, lease, or purchase of storage units, lockers, or safe deposit boxes";

- "United States and foreign currency and other monetary instruments";

- "Cameras";

- "Indicia of occupancy, residence, control or ownership of the listed premise and/or vehicles";

- "Travel Records";

- "Shipping records";

- "Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offenses listed above";

- "Any documents, records, programs, or applications tending to demonstrate the actual user(s) of computers found at [Mokbel's home]";

- "All records relating to the violations referenced above involving co-conspirators or associates of MOKBEL"; and

- "Electronically stored communications or messages reflecting computer on-line chat sessions, or e-mail or cellular messages with other co-conspirators."

(*Id.* at 3–5).  The warrant authorized agents to "examine all of the data contained in the computer devices to view their precise contents and determine whether the data falls within the items to be seized."  (*Id.* at ¶ 15(a)(iii)).

A Special Agent for Homeland Security Investigations, Robert Skidmore, provided an affidavit, which was included in the warrant application. (Docket Entry No. 33-2). The affidavit detailed Mokbel's involvement in the health care fraud scheme and stated that, based on telephone records, Mokbel's home appeared to be used as a meeting location between Mokbel and other suspects under investigation, and that Mokbel maintained an office at his home. (*Id.* at ¶¶ 38, 39). The affidavit included a statement of belief that the COVID-19 pandemic, which resulted in "a vast amount of businesses and their employees [] working from home or from a safe location," affected Mokbel's business operations. (*Id.* at ¶ 40). Although the affidavit was part of the warrant application provided to the magistrate judge, the warrant did not refer to the affidavit or any of the information contained within the affidavit.

FBI agents executed the search warrant soon after it issued, collecting documents, electronics, currency, and other miscellaneous items. (Docket Entry No. 33-3). These motions followed.

### B.      Particularity

Mokbel argues that the warrant to search for records and property in his home was a "general warrant" on several grounds. He argues that the warrant authorized an "all records" search relating to any violation of broad federal statutes; it had no date restriction; it did not limit the search to the 14 categories of listed records in Attachment B of the warrant; and it placed no meaningful limit on those categories. The government responds that broad warrants are permissible under the Fourth Amendment when "the defendant is suspected of widespread fraud and the investigation will require a review of business records." (Docket Entry No. 38 at 5).

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. CONST. amend. IV. "[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Mass. v. Sheppard*, 468 U.S. 981, 988 n.5 (1984)). "[T]he presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant." *Id.* at 559. "[M]ost Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.* at 557–58 (collecting cases).

"The Fourth Amendment's particularity requirement demands that the place to be searched and the items to be seized be described with sufficient particularity so as to leave 'nothing . . . to the discretion of the officer executing the warrant.'" *United States v. Allen*, 625 F.3d 830, 834–35 (5th Cir. 2010) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). "A general order to explore and rummage through a person's belongings is not permitted." *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A, 1981). "The test that is applied requires a court to ask if the description in the warrant would permit an executing officer to reasonably know what items are to be seized." *United States v. Beaumont*, 972 F.2d 553, 560 (5th Cir. 1992). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (citations omitted).

Broad warrants authorizing the seizure of property relating generally to federal offenses may be sufficiently particular, depending on how the allegations as to the criminal offense, the place to be searched, and the factual context combine to limit the executing officers' discretion.

Warrants for all business or financial records can be sufficiently particular if widespread fraud is alleged and the warrant narrows the records subject to search and seizure by date or subject matter. *United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000) ("[W]arrants using generic categories of evidence are adequately particular where the crime being investigated is likely to require examination of all of a business's records." (citing *United States v. Humphrey*, 104 F.3d 65, 69 (5th Cir. 1997))).  "Where probable cause exists to believe that an entire business was merely a scheme to defraud, or that all the records of a business are likely to constitute evidence, a warrant authorizing the seizure of all such records and describing them in generic terms is sufficient to meet the particularity requirement of the fourth amendment."  *Williams v. Kunze*, 806 F.2d 594, 598 (5th Cir. 1986) (citations omitted).  But "it is more difficult to demonstrate probable cause for an 'all records' search of a residence than for other searches."  *United States v. Cherna*, 184 F.3d 403, 409 (5th Cir. 1999) (citation omitted); *see also Riley v. California*, 573 U.S. 373, 396–97 (2014) ("Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house:  A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." (emphasis in original)).

Broad warrants relating to general federal statutory violations, without time, place, or subject matter limits, are impermissible under the Fourth Amendment.  In *Groh v. Ramirez*, the Supreme Court considered the particularity of a warrant that failed to identify specific items, listing only the house that the officers intended to search.  540 U.S. at 554.  Although the warrant did not specify items subject to search and seizure, the warrant application contained an itemized list of firearms and a detailed affidavit setting forth the basis for seizing them.  *Id.*  The Court held that the warrant was "plainly invalid," *id.* at 557, and it did not consider whether the affidavit or the

itemized list in the warrant application could cure the defect because "the warrant did not incorporate other documents by reference, nor did either the affidavit or the application . . . accompany the warrant." *Id.* at 558.

More recently, in *United States v. Allen*, 625 F.3d 830 (5th Cir. 2010), the Fifth Circuit, relying on *Groh*, held that a warrant was "undoubtedly broad," in "obvious error," and lacked particularity when it described the property to be seized as "[p]roperty designed or intended for use or which has been used as the means of committing a criminal offense or that contains evidence of the commission of a criminal offense." *Id.* at 836, 839.

Under the precedent, "the warrant at issue clearly does not pass constitutional muster." *Id.* at 836. The warrant authorizes agents to search Mokbel's home for, and seize, all personal, financial, and electronic records, documents, and devices relating to health care fraud, wire fraud, money laundering, and stolen property. The warrant contains no date range, does not restrict the search to a home office, and provides no factual context. The warrant does not limit the categories of items to be seized, such as "personal records," by the subject matter or otherwise, such as describing them as "personal records relating to healthcare." *Cf. Williams*, 806 F.2d at 596 & n.1 (a warrant authorizing the seizure at a business office of eight categories of documents relating to fund transfers and credit card transactions in the Cayman Islands and the Turks and Caicos or similar transactions was sufficiently particular). The warrant does not refer to the affidavit, and the government does not argue that the affidavit was incorporated into the warrant. *See Beaumont*, 972 F.2d at 561 ("[T]he warrant [must] contain, at the very least, a cursory reference to the affidavit upon which an executing officer may have to rely.").

The warrant does not limit the officers' discretion in deciding what electronic records or devices, or paper records or other documents, anywhere in Mokbel's home, could be searched for

and seized as evidence of the broad offenses of wire fraud, health care fraud, stolen property, or money laundering.  *See Cook*, 657 F.2d at 733–34 (a warrant to search for evidence of criminal copyright infringement was not sufficiently particular when it permitted the seizure of "cassettes on to which . . . copyrighted films . . . have been electronically transferred and recorded" (alteration in original)).  Other circuits agree that a warrant's "reference to a broad federal statute is not a sufficient limitation on a search warrant."  *United States v. Leary*, 846 F.2d 592, 594, 601–02 (10th Cir. 1988); *see also United States v. Sims*, 553 F.3d 580, 581–82 (7th Cir. 2009); *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990); *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982); *United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980).

The warrant appears to fail the Fourth Amendment particularity requirement and is facially deficient on that basis.

## C.     The Good-Faith Exception

"When the Government conducts a search pursuant to a warrant that does not particularly describe the things to be seized, the appropriate remedy is for the court to exclude from the evidence in a later criminal action the items improperly taken," *Cook*, 657 F.2d at 734, unless the good-faith exception applies, *United States v. Leon*, 468 U.S. 897, 922–24 (1984).  "The good-faith exception requires answering the question of 'whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) (citations omitted).  In the Fifth Circuit, there is no good-faith exception if one of four circumstances exists:

> (1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing

> magistrate/judge wholly abandoned his or her judicial role; (3)
> where the warrant is based on an affidavit so lacking in indicia of
> probable cause as to render official belief in its existence entirely
> unreasonable; and (4) where the warrant is so facially deficient in
> failing to particularize the place to be searched or the things to be
> seized that the executing officers cannot reasonably presume it to be
> valid.

*United States v. Payne*, 341 F.3d 393, 399–400 (5th Cir. 2003) (citation omitted).

Mokbel argues that the good-faith exception does not apply because the warrant was so facially deficient that no reasonable agent could have reasonably presumed it to be valid. The government argues that the good-faith exception applies because "all records" searches are not facially deficient when an affidavit, even if not referred to or incorporated into the search warrant, details the alleged crimes and objects of the search. Mokbel also requests a suppression hearing to the extent the government relies on the affidavit to justify applying the good-faith exception. (Docket Entry No. 33 at 14 n.3).

The "Fourth Amendment does not require the suppression of evidence obtained as a result of objectively reasonable reliance on a warrant." *Cherna*, 184 F.3d at 407. "When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Leon*, 468 U.S. at 924. In determining good faith, courts consider whether officers executing the warrant relied on unincorporated materials in certain circumstances. In *Beaumont*, the Fifth Circuit held it was appropriate to consider an unincorporated affidavit when determining whether the good faith-exception applied to a warrant lacking particularity because "the affidavit provided specific information of the objects of the search, the executing officer was the affiant, the additional officers making the search knew what was to be searched for, and finally, the warrant could easily have been made valid by

the insertion of the phrase 'see attached affidavit.'"  972 F.2d at 562; *see also United States v. Shugart*, 117 F.3d 838, 846 (5th Cir. 1997).

In *Cherna*, the Fifth Circuit scrutinized a warrant similar to the one at issue here.  In *Cherna*, the warrant authorized the seizure of "[r]ecords and items related to Fraud by Wire and Mail Fraud as described in the affidavit of FBI agent Loretta Smitherman, within the premises of [the residence] including, but not limited to" an additional 26  categories of evidence.  184 F.3d at 406 (internal quotations omitted).  The affidavit was not attached to the search warrant.  *Id.* Finding good faith, the Fifth Circuit recognized that the officers had: (1) "prepared a detailed affidavit that was reviewed by two Assistant United States Attorneys"; (2) "presented the affidavit to a neutral magistrate judge, who found it sufficient to support probable cause to search [the defendant's] residence"; (3) executed a warrant that "referenced" the affidavit and that "contained a list of twenty-six categories of evidence subject to seizure"; (4) and "read the affidavit and, therefore, were familiar with the objects of the search."  *Id.* at 414.  The Fifth Circuit affirmed the denial of the defendant's motion to suppress because "the officers in this case took every step that could reasonably be expected of them," and the "law simply does not require a reasonable officer to do more."  *Id.*  (citations omitted).

Similarly, in *Allen*, the good-faith exception applied to a challenge to a broad warrant to search a defendant's home for evidence of generally described crimes, in part because copies of more particular affidavits and attachments were provided to the agent serving as the affiant, along with "all of the agents and law enforcement officers who participated in the search."  625 F.3d at 837.  Although the warrant was an "obvious error," the Fifth Circuit explained that

> [t]he distinguishing factor in this case is that the magistrate judge
> signed not only the warrant, but also the affidavit, to which the list
> of items to be seized was attached.  Thus, the executing officer who

> prepared the warrant, the affidavit and the attachment and had them
> reviewed by his colleagues, the prosecutors and the magistrate judge
> had additional objective reason to believe the warrant was valid.
> Because of this, the officer's conduct was less culpable, and
> therefore less likely to be deterred by applying the exclusionary rule
> . . . .

*Id.* at 839; *but see Groh*, 540 U.S. at 565 n.8 (the court did not consider an unincorporated application or affidavit when considering whether an officer could reasonably rely on authorized warrant under the qualified immunity "objective reasonableness" standard, which the court noted was similar to the good-faith standard).

The government points to evidence that the affidavit here was: (1) reviewed by a federal magistrate judge in connection with the application for the search warrant; (2) included in a single digital file containing the warrant and Attachments A and B; and (3) prepared by the federal agent who coordinated the execution of the warrant.   (Docket Entry Nos. 38-1, 38-2).   But the government does not identify where in the current record there is evidence that the affidavit was attached to the warrant provided to the officers conducting the search, or that the affidavit was otherwise provided to or reviewed with those officers before they conducted the search.   In *Beaumont*, *Cherna*, and *Allen*, the courts noted that an affidavit that was not attached to or incorporated into the warrant was at least provided to, or reviewed by, the officers who not only prepared the affidavit, but also those who were responsible for executing the search.   A hearing will allow the court to determine whether the officer who "coordinated the search" and who had written the affidavit provided or reviewed the affidavit to or with the officers who executed the search.

If the court does not consider the affidavit, the warrant, which authorizes the search of every personal, financial, and electronic record or device within Mokbel's home, appears to be so

"facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid." *Payne*, 341 F.3d at 400 (citation omitted); *see also Leary*, 846 F.2d at 609–10; *United States v. Spilotro*, 800 F.2d 959, 968 (9th Cir. 1986). Because the warrant authorizes such a broad and general search, the facts showing whether the executing officers had access to the affidavit or had sufficient information about it make a difference to the suppression decision. *See Humphrey*, 104 F.3d at 67, 69 (an "all records" search of the defendants' home was permissible where a supporting affidavit showed that "the residence was the primary place of business for the defendants, where the fraud was pervasive, where there was a significant overlap in the business and personal lives of the defendants, where the defendants maintained no known bank accounts, and where the warrant was limited to financial records"); *see also Davis*, 226 F.3d at 349–50, 52 (the good-faith exception applied to a warrant authorizing a search of the defendant's home and office for 15 categories of paper and electronic financial records limited by date and supported by the affidavit); *United States v. Abdallah*, No. H-07-cr-155, 2007 WL 4334106, at *15 (S.D. Tex. Dec. 7, 2007) (permitting a broad search supported by an affidavit).

A suppression hearing is set for **October 19, 2021** at **10:15 A.M. CDT**, in Courtroom 11B to enable the court to determine the role the affidavit played in the search of Mokbel's home.

## II.     Return of Property

### A.     The Warrants for Seizure of Funds

On the same day that federal agents searched Mokbel's home, the government also executed warrants to seize funds from four accounts at Regions Bank. Mokbel challenges the seizure of funds from two accounts that belonged to 4M Pharmaceuticals, which contained around $6.5 million. (Docket Entry No. 39 at 2; Docket Entry No. 39-2 at 2).

Special Agent Jason Doud with the Food and Drug Administration Office of Criminal Investigations provided an affidavit in support of the seizure warrant.  (Docket Entry No. 39-2).  The affidavit stated that there was probable cause to find that the bank accounts were used to accept proceeds "in a healthcare fraud scheme whereby tens of thousands of patients' personal information was used to electronically transmit fraudulent prescriptions and fraudulent claims for reimbursement to health insurance providers without valid prescriptions and/or without the involvement of the patients' physicians." (*Id.* at 3).  The affidavit was based on an investigation that Agent Doud conducted by interviewing patients of six different 4M pharmacies thought to have been involved in the unlawful scheme.  Based on the interviews, Agent Doud stated as follows in the affidavit:

- the funds sought in the warrant were proceeds from health care fraud as evidenced by interviews with 30 patients at six different pharmacies who claimed to have received unnecessary prescription medications or medical supplies without their consent;

- the health care proceeds were originally deposited into accounts at Allegiance Bank;

- the Allegiance Bank accounts were closed in February 2020;

-  Mokbel obtained cashier checks from the Allegiance Bank accounts and deposited the checks into the Regions Bank accounts between February 2020 and September 2020;

- 4M account x3734, with a last known balance of around $450,000, is believed to consist of all fraud proceeds because it received a transfer of $800,000 in October 2020 from another seized account that had recently received a cashier's check deposit of around $1,000,000;

- 4M account x4137, with a last known balance of around $6 million, consists of the proceeds of three CDs, for which Mokbel was the sole signator; and

- the funds in account x4137 can be traced to health care fraud proceeds because payments from CVS Health and Express Scripts were placed into the CDs, which were redeemed into cashier's checks and deposited into the account in September 2020.

(Docket Entry No. 39-2 at 5–25).

### B.  *Franks* Hearing

Although the affidavit discusses interviews with 30 patients, only four pharmacies are traced to the two 4M accounts at issue, and five patients were interviewed per pharmacy, for a total of 20 patients.  (Docket Entry No. 39 at 4).  Mokbel argues that the affidavit supporting the warrant for the seizure of funds does not establish probable cause to seize all health care proceeds in the two 4M bank accounts.  Instead, Mokbel contends that probable cause existed only to seize the small amounts described in the summaries of the 20 patient interviews.  In the alternative, Mokbel argues that even if the affidavit facially establishes probable cause to seize the entire amount, the affidavit contains material falsehoods warranting a *Franks* hearing.

Mokbel brings his motion under Rule 41(g) of the Federal Rules of Criminal Procedure.  The government responds by arguing that a Rule 41(g) motion to return seized property "is an improper vehicle after indictment because it is an equitable remedy and the Defendant has an adequate remedy at law—the opportunity to challenge forfeiture on the merits in the event of his conviction."  (Docket Entry No. 48 at 5).  Alternatively, the government argues that if the motion is proper, Mokbel has failed to make the showing required for a *Franks* hearing.

Rule 41(g) of the Federal Rules of Criminal Procedure provides:

14

> **Motion to Return Property.**  A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  The motion must be filed in the district where the property was seized.  The court must receive evidence on any factual issue necessary to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

FED. R. CRIM. P. 41(g).

The government may use two main methods to seize property related to a criminal offense before a conviction.  First, under 21 U.S.C. § 853(e)(1), the government may apply for a protective order and "the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property," if: (a) an indictment alleges that the property would be subject to forfeiture under this section; or (b) after a hearing, the court determines "there is a substantial probability that the United States will prevail on the issue of forfeiture."  Second, under 21 U.S.C. § 853(f), the government "may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant."

Mokbel moved under Rule 41(g) for the return of the money seized in reliance on the warrant.  He filed the motion after indictment, but before any forfeiture proceeding.  The indictment provides notice from the government that the property and assets related to a criminal conviction may be subject to forfeiture.  Mokbel may challenge the seizure of the 4M account funds under a Rule 41(g) motion.

Mokbel argues that even assuming the affidavit is complete and accurate, it does not establish probable cause to seize all $6.5 million in the accounts.  A warrant must not be overbroad, "meaning, 'there must be probable cause to seize the particular things named in the warrant.'"

*United States v. Sanjar*, 876 F.3d 725, 735 (5th Cir. 2017) (citation omitted).  In the Fifth Circuit, evidence of health care fraud among several patients may be sufficient to support probable cause that the fraud extends more broadly, to the entire patient base or at least to all patients receiving treatment or prescription medication for a particular condition or illness.  In *Sanjar*, the defendants were charged with conspiring to commit health care fraud.  *Id.*  The court held that evidence in the affidavit obtained from interviewing two patients and two former employees was sufficient to support probable cause of a broad scheme, defeating the defendant's argument that a warrant authorizing the seizure of "all patient files" was too broad.  *Id.* at 736.

The government relied on interviews with 20 patients of 4M Pharmacies to establish probable cause that a broad health care fraud scheme existed and that all the 4M Pharmacies proceeds in the bank account from pharmacy benefit managers were tainted.  Mokbel argues that this is an impermissible extrapolation because even assuming all proceeds from the 20 patients were the proceeds of health care fraud, those proceeds consisted of between $4,000 to $17,000 for each of the four pharmacies at issue, which Mokbel characterizes as "minuscule" compared to the $6.5 million seized.  (Docket Entry No. 39-3, Table B).  In *Sanjar*, the Fifth Circuit held that evidence of health care fraud based on interviews with two patients and two employees supported a lawful seizure warrant for "all patient files."  In the present case, 20 patient interviews showing probable cause that a health care fraud scheme existed is sufficient to support a warrant to seize "all funds" representing health care proceeds (even if this would not support forfeiture of all funds in later proceedings after a jury determines which funds are tainted and which are not).  The affidavit, on its face, establishes probable cause to seize the funds in the 4M Pharmacies accounts received from pharmacy benefit managers.

16

Although an affidavit may facially establish probable cause, a defendant may challenge the veracity of the affidavit. *Franks v. Delaware*, 438 U.S. 154 (1978). "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56; *United States v. Minor*, 831 F.3d 601, 603–04 (5th Cir. 2016). "An omission may amount to improper government conduct only if the omission is material and the defendant shows that the affiant excluded material information 'with the intent to mislead the magistrate.'" *United States v. Torres*, 694 Fed. Appx. 937, 944 (5th Cir. 2017) (citing *United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995)).

Mokbel points to a number of affidavit statements that he argues are material and false or misleading, giving rise to an inference that Agent Doud had at least a reckless disregard for the truth. First, Mokbel takes issue with the method used to determine the amount of the tainted funds in the pharmacy accounts subject to seizure. The affidavit sets out a lowest intermediate balance rule ("LIBR") method to determine the amount of tainted funds in each account. Mokbel argues, and submits an expert report concluding, that the LIBR analysis impermissibly ignores deposits of untainted funds into the accounts. (Docket Entry No. 39-3 at 2, 4). The government argues in response that accounting principles are a subject for cross-examination at a forfeiture proceeding and that the court should not address this argument here. The court disagrees. The amount of untainted versus tainted funds goes to the question of what the government had probable cause to seize.

In the alternative, the government argues that the accuracy of the LIBR method does not matter so long as the affidavit establishes that "more than $10,000.01 in fraud proceeds was part

of each identified money laundering financial transaction," making all the money in the accounts subject to forfeiture.  (Docket Entry No. 48 at 12).  Mokbel argues that merely pooling tainted and untainted funds in an account does not make the entire account subject to forfeiture or seizure.  Instead, Mokbel argues, the government must make a showing that all the money in the account, tainted and untainted, was part of, or used to facilitate, the alleged money laundering transaction.

Money laundering is a federal crime when someone "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."  18 U.S.C. § 1957(a).  Under the relevant criminal forfeiture statute, if a criminal conviction is obtained for money laundering, a court must "order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1).

The relevant statutes do not provide that the entire amount of an account that contains both lawful and unlawful proceeds is subject to forfeiture if the government makes a showing that at least $10,000 was part of a money laundering transaction.  Neither does Fifth Circuit precedent.  In *United States v. Tencer*, 107 F.3d 1120 (5th Cir. 1997), the defendants were convicted of submitting fraudulent claims to insurance companies for chiropractic services that were not provided to patients as represented and for laundering the proceeds.  *Id.* at 1124.  When determining whether the government could seize both legitimate and illegitimate funds, the Fifth Circuit agreed with the Southern District of New York that the "forfeiture of legitimate and illegitimate funds commingled in accounts [is] proper as long as the government demonstrated that the defendant had pooled the funds to disguise the nature and source of his scheme."  *Id.* at 1135.

The government argues that *Tencer* does not apply because the defendant in that case was convicted under § 1956, not under § 1957.  Section 1957 prohibits any person from "knowingly

engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," 18 U.S.C. § 1957(a).  By contrast, § 1956 requires a transaction designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" or "to avoid a transaction reporting requirement under State or Federal law," 18 U.S.C. § 1956(a)(1)(B).  In *Tencer,* the Fifth Circuit was not interpreting § 1956.  Instead, the Fifth Circuit was interpreting the criminal forfeiture statute provision stating that after conviction of § 1956 or § 1957 money laundering, the defendant must forfeit "to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  107 F.3d at 1134–55 (interpreting 18 U.S.C. § 982(a)(1)). The court had to determine in what circumstances untainted funds intermingled with tainted funds could be considered "involved in" the offense of money laundering charged in that case.  *See United States v. Rodriguez*, No. 20-10563, 2021 WL 3716405, at *1 (11th Cir. Aug. 23, 2011) (recognizing that forfeiture was proper under § 1957 "if the government has demonstrated that 'the defendant pooled the funds to facilitate or 'disguise' the illegal scheme").

Because only funds "involved in" the alleged health care fraud scheme are subject to potential forfeiture, whether the LIBR approach presented in the affidavit was the proper approach is properly considered before forfeiture, because that issue goes to whether the government showed probable cause to seize all the funds in each of the 4M Pharmacies accounts.[1]

---

[1]  The government also relies on *United States v. Sanders*, 952 F.3d 263 (5th Cir. 2020) and *United States v. Huber*, 404 F.3d 1047, 1056–62 (8th Cir. 2005).  But in *Sanders*, the government had established an overwhelming link between almost all funds at issue and the money laundering warranting seizure of all funds.  *Sanders*, 952 F.3d at 286–87.  And in *Huber*, the government established that legitimate funds promoted the underlying fraud.  *Huber*, 404 F.3d at 1059.

Next, using examples from five different patients, Mokbel argues that the government misrepresented the interviews of those patients in the affidavit used to support the probable cause determination of pervasive health care fraud.  The government argues first that the affidavit does not contain falsehoods simply because the government chose to "characteriz[e] the facts in a particular way," *United States v. Hare*, 772 F.2d 139, 141 (5th Cir. 1985) (citation omitted), and second, even if the affidavit contains falsehoods, they were not material to the probable cause determination.  Each of the examples Mokbel cites is described below.

**Patient MB**.  Statements in the affidavit describe the interview with Patient MB in relevant part as follows:

> MB advised that he completed an online survey/questionnaire and began to receive phone calls from pharmacies (unknown names). MB said he received shipments once a month for a year and received approximately 20 lidocaine tubes and 20 calcipotriene cream tubes via mail. . . . MB said he was told that insurance would take care of the bill and the pharmacy would contact his doctor for the prescription.  MB stated that the creams were cancelled because Family Pharmacy had sent him more creams than allowed per California State Law.  MB advised he was not aware the creams were so costly, and he never paid a copay to Family Pharmacy for the medications, as indicated on the billing records for payment made to Family Pharmacy on behalf of MB.

 (Docket Entry No. 39-2 at 7–8).

Mokbel points to statements in the interview report but omitted in the affidavit, arguing that the omitted statements contradict finding that the prescriptions were unnecessary or sent without consent.  The omitted statements included: (1) "[w]hen asked if [the patient] had received any items that he or his doctor did not order, [MB] replied no"; and (2) "[MB] said he did give the caller permission to send him the items."  (Docket Entry No. 40-1 at 2–3).

**Patient MM**: Statements in the affidavit describe the interview with Patient MM in relevant part as follows:

> MM advised that she completed an online questionnaire/survey and afterwards received a call from someone asking her if she wanted to receive creams.  MM said she had dry skin and accepted the creams. MM said the caller told her they would contact her doctor for a prescription, and she was told that the cost would be covered by insurance and that Medicare would be billed. MM said that she had received three shipments of calcipotriene and clobetasol cream, each shipment containing 2 tubes of creams.  MM said she told the pharmacy not to send anymore creams as they had sent too much. MM said the pharmacy "sent her stuff she didn't ask for", referring to the creams, and she never paid a copay as indicated in billing records for payment made to Family Pharmacy on behalf of MM.

(Docket Entry No. 39-2 at 8).

Mokbel points to omissions from the affidavit of statements in the interview report that would undermine showing probable cause to find health care fraud.  The statements omitted from the affidavit included:  (1) "When asked if she received any of the items that she or her doctor did not order, [MM] said she thinks they had spoken to her doctor"; and (2) "[MM] said she did give the caller permission to send her the items."  (Docket Entry No. 40-2 at 2–3).

**Patient KB**: Statements in the affidavit describe the interview with Patient KB in relevant part as follows:

> KB stated that he received a phone call from an unknown pharmacy and the caller said that they would be providing medications as requested by his doctor.  KB said between 2016 – 2018, the pharmacy took it upon themselves to send him three tubes per month of calcipotriene and lidocaine creams.  KB stated he had never heard of Family Pharmacy.  KB said that he believed the items were mailed in a manner "similar to an auto refill", and he told his doctor he thought it was a scam.  KB said the shipments were cancelled, he was not sure that his doctor was the reason for the cancellation. KB said he suspected that a fax was sent to the doctor's office requesting a refill, as if the request was being made by the patient for the refill. KB advised payment would have been made via Medicare and he

21

> never paid a copay.  Records indicated payments made on behalf of
> KB to Family Pharmacy and $95.00 copays.  KB advised he never
> paid a copay.

(Docket Entry No. 39-2 at 9).

Mokbel points to omissions from the affidavit of statements in the interview report that:
(1) "When asked if any of the items he received were not ordered by [KB] o[r] his doctor, [KB]
said his doctor originally ordered the items but the company/pharmacy took it upon themselves to
ship 3 tubes per month of calcipotriene and lidocaine creams"; and (2) "[KB] said he must have
given them [the pharmacy] permission to send the items and he 'probably' was asked and gave the
caller his personal information."  (Docket Entry No. 40-3 at 2–3).

**<u>Patient DL</u>**: Statements in the affidavit describe the interview with Patient DL in relevant
part as follows:

> DL advised that she had received numerous medications from
> Primary Care Pharmacy that her doctor had not ordered.  DL advised
> that none of her physicians had prescribed her the medications sent
> to her via mail from Primary Care Pharmacy.  DL advised that she
> never made a payment to Primary Care Pharmacy, but she was
> aware that her insurance (United Healthcare) had been billed. DL
> advised she had received lidocaine, hydrocortisone, calcipotriene,
> and omega 3 fish oils via mail from Primary Care Pharmacy.  DL
> advised that she called Primary Care Pharmacy and told them to stop
> sending the shipments of medications. Records indicated payment
> made to Primary Care Pharmacy on behalf of DL.

(Docket Entry No. 39-2 at 10).

Mokbel points to omissions from the affidavit of statements in the interview report that:
(1) "[DL] stated she has been diagnosed with skin conditions such as Eczema and Dermatitis.  [DL]
stated her doctor prescribed lidocaine topical cream, hydrocortisone topical cream, and
calcipotriene topical cream to treat her skin conditions."  (Docket Entry No. 40-4 at 3).

**Patient BK**: Statements in the affidavit describe the interview with Patient BK in relevant part as follows:

> BK advised she believed she might have received items in the mail two years ago and had received diclofenac gel three or four years ago but did not recall Distinguished Pharmacy. BK advised she did not believe she used the pharmacy in the past and had not paid any copays to Distinguished Pharmacy. BK was not aware of an insurance payment made to Distinguished Pharmacy on her behalf. BK advised she did receive a call in the past and she thought the caller told her that they would call her doctor, but she was not sure. Records indicated several payments made on behalf of BK to Distinguished Pharmacy for calcipotriene cream in 2018 – 2019.

(Docket Entry No. 39-2 at 15).

Mokbel points to omissions from the affidavit of statements in the interview report that: (1) "When asked if she ever received any items that she or her doctor did not order [BK] said no"; (2) "[BK] said she probably gave the caller permission to send her the items"; and (3) BK had been diagnosed with eczema. (Docket Entry No. 40-5 at 2–3).

Mokbel has pointed to several statements from the patient interviews that Agent Doud omitted from the affidavit. These omitted statements from the interviews are inconsistent with the summary of the interviews Agent Doud presented in the affidavit to show probable cause that the patients received prescriptions they did not medically need or that they did not consent to receiving. The inconsistencies and omissions, if occurring in other patient interviews summarized in the affidavit, are important to determining whether the omissions are material to the probable cause determination. A *Franks* hearing will permit the court to consider this issue.

Last, Mokbel submits an expert report showing that no federal health care funds were paid to Mace RX Pharmacy for five of the interviewed patients, despite the affidavit claiming so.

(Docket Entry No. 39-3, Table B).[2]  The government conceded this mistake at the motions hearing, describing it as an "innocent mistake."  (Docket Entry No. 58).  But combined with the other omissions and the questions raised as to the propriety of how the LIBR method was conducted, this serves as an additional source of doubt as to the reliability of the affidavit.[3]

In sum, Mokbel has brought into question the veracity of the LIBR method and the descriptions of the patient interviews.  Both are material to the probable cause determination for the seizure of the funds in the accounts.  The LIBR method goes to how much of the account contents should have been seized, and the affidavit omissions go to probable cause to find a pervasive fraud scheme.  The number and consistency of the omissions makes a sufficient showing that the affidavit contained material misrepresentations.  A *Franks* hearing is needed to resolve these issues on a reliable and careful basis.

## III.    Conclusion

The suppression and *Franks* hearings will take place on **October 19, 2021** at **10:15 A.M. CDT**, in Courtroom 11B.  The court will rule on the pending motions, (Docket Entry Nos. 33, 39, 41), after the hearing.

SIGNED on October 5, 2021, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

---

[2]  Mokbel has pointed out that Mace accounted for around $2 million deposits in one of the 4M accounts at issue.  (Docket Entry No. 57 at 2 n.2).

[3]  Mokbel also takes issue with the fact that health care payments to the pharmacies for the 20 patients were "a tiny fraction of the total federal health care payments received."  (Docket Entry No. 39 at 4).  The court does not consider this to be a false statement or omission.  Agent Doud did not represent or suggest in the affidavit that the patients interviewed were a large source of the health care payments in the fraudulent scheme.