**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | **Criminal No. 4:21-cr-103** |
| **MOHAMED M. MOKBEL,** | § | |
| **FATHY ELSAFTY,** | § | |
|     **a.k.a. Fathy Aly** | § | |

**<u>AMENDED FOURTH SUPERSEDING INDICTMENT</u>**

The Grand Jury charges:

**<u>General Allegations</u>**

At times material to this Fourth Superseding Indictment, unless otherwise specified:

**<u>Health Care Benefit Programs</u>**

*The Medicare Program*

1.      The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years or older or disabled.  The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Each Medicare beneficiary was identified with a unique beneficiary identifier number ("BIN"). These BINs were used, among other things, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. Two types of BINs established under Title 42, United States Code, Chapter 7, subsection XVIII, were Health Insurance Claim Numbers ("HICNs") and Medicare Beneficiary Identifiers ("MBIs").

1

3.     HICNs were typically comprised of the beneficiary's social security number and often included one or more additional letters. In 2015, Congress passed the Medicare Access and CHIP Reauthorization Act ("MACRA") which mandated that CMS phase out the use of social security numbers in the assignment of BINs. Following the passage of MACRA, CMS began to assign Medicare beneficiaries MBI numbers, which were comprised of a unique series of 11 randomly generated numbers and letters. MBI numbers, like HICNs, were used to identify qualifying beneficiaries in all Medicare transactions such as billing and claim submissions. HICNs and MBI numbers are hereinafter referred to collectively as ("BINs").

4.     Medicare programs covering different types of benefits were separated into different program "parts."  Medicare Part D ("Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

5.     To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

6.     A pharmacy could participate in Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs").  A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.  OptumRX, Inc. (OptumRX); Express Scripts, Inc. ("Express Scripts"); and Caremark LLC, doing business as ("D.B.A.") CVS/Caremark ("CVS/Caremark"), among others, were Medicare drug plan sponsors and/or PBMs.

7.      When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan.  The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

8.      Medicare, through CMS, compensated the Medicare drug plan sponsors.  Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans, which was adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's monthly fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

9.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

*The Medicaid Program*

10.     The Medicaid Program ("Medicaid") was a state-administered health insurance program funded by the United States Government and by individual states, including the States of Texas and Ohio. Medicaid helped pay for reasonable and necessary medical procedures and services provided by qualified health care professionals to individuals who were deemed eligible under state low-income programs.  Medicaid was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965.

11.     Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

12.     Among the types of reimbursable medical assistance available to Medicaid

3

recipients are office visits, diagnostic testing, prescription drugs, and durable medical equipment.

*Commercial Insurance*

13.     Commercial insurance companies provided health care benefits for individuals enrolled with their plans, often referred to as "members."  These private insurance companies were "health care benefit programs" within the meaning of Title 18, United States Code, Section 24(b), that affected commerce.

14.     Commercial insurance companies, employers, and private entities offered drug plans, which were administered and operated by PBMs.  A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

15.     A member of a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

16.     Express Scripts, CVS/Caremark, and Optum RX, among others, among others, were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

**Diabetes and Diabetes Supplies**

17.     Diabetes is a chronic condition characterized by high blood glucose (sugar) that result from defects in the body's ability to produce and use insulin. Diabetes is a disease which must be managed closely to avoid the risk of serious illness, complications and even death. Treatment of patients with diabetes includes monitoring blood sugar, taking anti-diabetic medications, orally or by administering insulin, and/or other treatment options.

18.     Medical supplies associated with the delivery of insulin to the body can be reimbursed by Medicare. These supplies include, but are not limited to: syringes, needles, alcohol swabs, gauze, and insulin injection delivery devices.

19.     Blood glucose stripes, also known as diabetic test stripes (hereinafter "diabetic test stripes"), were used by patients with diabetes and pre-diabetes to monitor their blood sugar enabling them to regulate their diet and medication.

20.     A doctor's prescription was needed for diabetic test strips to be reimbursed by the patient's health care benefit program.

**Topical Creams and Omega-3 Pills**

21.     Calcipotriene topical cream is used to treat plaque psoriasis of the skin and scalp.

22.     Lidocaine topical ointment is used to temporarily numb and relieve painful skin conditions, including minor burns, skin abrasions, insect bites, and other conditions affecting mucous membranes.

23.     Clobetasol propionate is a high potency topical steroid cream used for short-term relief of inflammatory and pruritic skin conditions.

24.     Halobetasol propionate is a high potency topical steroid cream used for short-term relief of inflammatory and pruritic skin conditions.

25.     Diclofenac Sodium 3% topical gel is used for the topical treatment of actinic keratosis (abnormal skin growth caused by too much ultraviolet light) and arthritis.

26.     Calcipotriene, lidocaine, clobetasol propionate, halobetasol propionate, and diclofenac sodium topical gel are hereinafter referred to collectively as "topical creams".

27.     Omega-3-acid ethyl esters (hereinafter "Omega-3 pills") are used to lower very high triglyceride (fat-like substance) levels in the blood.

28.     A doctor's prescription was needed for certain topical creams, ointments, and gels and Omega-3 pills to be reimbursed by the patient's health care benefit program.

**Claims Adjudication**

29.     Providers, including pharmacies, entered into contractual relationships with PBMs either directly or indirectly.  If indirectly, providers first contracted with pharmacy network groups, or PSAOs, which then contracted with PBMs on behalf of providers.  Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

30.     For prescription drugs to be reimbursed, health care benefit programs required that they be dispensed pursuant to a valid prescription and be medically necessary for the treatment of covered illnesses or conditions.

31.     Copayments set by the health care benefit programs were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received.

32.     Most, if not all, PBMs required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced, in part because consistent copayment collection was a fraud prevention measure—copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to their treatments.

33.     Upon receiving prescriptions and dispensing prescription drugs, pharmacies submitted claims to health care benefit programs or PBMs.  Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

34.     PBMs adjudicated claims submitted electronically in states other than Texas.

**<u>Relevant Entities, Defendants, and Individuals</u>**

35.     The following licensed pharmacies, described in the chart below, were formed, acquired, or purchased between 2013 and 2021, and hereinafter referred to collectively as the "4M

Pharmacies":

| Name | Location |
|---|---|
| A-Class Park Place Pharmacy, LLC | Fort Worth, Texas |
| Apex Dialysis & Pharmacy, LLC D.B.A. Patient Choice Pharmacy | Sugar Land, Texas |
| Distinguish Pharmaceuticals, LLC D.B.A. Distinguished Pharmacy ("Distinguished Pharmacy") | Houston, Texas |
| Elite Pharmacy Services, LLC D.B.A. Discount Plus Pharmacy | Missouri City, Texas |
| Executive Business Solutions, LLC D.B.A. Fort Bend RX Pharmacy ("Fort Bend RX Pharmacy") | Missouri City, Texas |
| Family Pharmacy, LLC ("Family Pharmacy") | San Juan Capistrano, California |
| Grand RX, LLC ("Grand RX") | Richmond, Texas |
| Iwo Pharmacy and Wellness, LLC ("Iwo Pharmacy") | Missouri City, Texas |
| Mace RX Pharmacy, LLC | Houston, Texas |
| MK Pharmacy, LLC | Houston, Texas |
| Primary Care Pharmacy, LLC | Houston, Texas |
| Reliable Pharmacy, LLC | Marco Island, Florida |
| Rx Compounding Solutions, LLC D.B.A. Pharmacare Plus Pharmacy ("Pharmacare Plus Pharmacy") | Houston, Texas |
| Universal Healthcare Network, LLC D.B.A. One Choice Pharmacy ("One Choice Pharmacy") | Stafford, Texas |

36.     4M Pharmaceuticals, LLC ("4M"), a Texas Limited Liability company, was a management company formed in or around February 2016.  4M was based in Houston, Texas, and located within the Southern District of Texas. From 2016 until at least 2021, 4M served as the headquarters, parent company, and call center for the 4M Pharmacies.

37.     **MOHAMED M. MOKBEL** ("**MOKBEL**") resided in Houston, Texas, within the Southern District of Texas. **MOKBEL** was the founder and C.E.O. of 4M. **MOKBEL** owned and operated 4M. **MOKBEL** also effectively owned and operated the 4M pharmacies.

38.     **FATHY ELSAFTY** ("**ELSAFTY**") resided in Houston, Texas, within the Southern District of Texas. **ELSAFTY** provided accounting and tax services for **MOKBEL** and 4M. **ELSAFTY** also held ownership and management interests in 4M pharmacies. **ELSAFTY** held legal or financial ownership in the following 4M Pharmacies: Reliable Pharmacy, Family

Pharmacy, Iwo Pharmacy, Pharmacare Plus Pharmacy, and One Choice Pharmacy.

39.     G.R. was the owner of Company 1, a company that sold patient information and/or patient referrals to the 4M Pharmacies.

40.     C.H. was the general manager of 4M.

41.     M.E. was an employee of 4M.

42.     E.Y. was an employee of OptumRX, a PBM, and worked as a credentialing specialist responsible for enrolling new pharmacies with Optum RX.

### The Fraudulent Scheme

*Overview of the Scheme*

43.     The Defendants and their coconspirators engaged in a scheme and artifice to defraud Medicare, Medicaid, and private health care benefit programs, generally administered through the PBMs, by submitting and causing to be submitted, through the 4M Pharmacies, false and fraudulent claims for topical creams, Omega-3 pills, and other prescription drugs.  These prescriptions were often medically unnecessary, not provided, based on illegally purchased Medicare BINs and/or kickbacks, based on false representations to prescribers, patients, and/or the PBMs, and/or copayments were not properly collected. Over the course of the scheme, which began no later than 2014 and continued at least through 2021, the 4M Pharmacies were paid approximately $140 million for drugs.

*Object and Purpose of the Scheme*

44.     It was an object and purpose of the scheme for the Defendants **MOHAMED MOKBEL**, **FATHY ELSAFTY** and their coconspirators known and unknown to unlawfully enrich themselves by, among other things, submitting or causing the submission of false and fraudulent claims to health care benefit programs, that is, Medicare, Medicaid, and other

government and private health care benefit programs, generally administered by PBMs, for topical creams, Omega-3 pills and other prescription drugs that were often medically unnecessary, not provided, based on illegally purchased Medicare BINs and/or kickbacks, based on false representations to prescribers, patients, and/or the PBMs, or copayments were not properly collected.

*Executions of the Scheme*

45.     Beginning no later than 2014 and continuing through in or around 2021, **MOKBEL** partnered with **ELSAFTY** and others to found, own, and operate the 4M Pharmacies.  The 4M Pharmacies contracted with PBMs to file claims for reimbursement for pharmaceutical drugs as a retail pharmacy or a community pharmacy.

46.     To obtain customers for 4M pharmacies, **MOKBEL** paid and caused the payment of kickbacks to G.R. and others in exchange for referring Medicare beneficiaries and/or distributing the personal information of thousands of Medicare beneficiaries, including their names, dates of births, social security numbers, BINs, and information about their treating physician. **MOKBEL** obtained the personal information of specifically targeted diabetes patients who are dependent on diabetic testing supplies to manage their blood sugar levels. **MOKBEL** also targeted patients suffering from pain and/or dry skin.

47.     From July 2016 until August 2020, **MOKBEL** paid G.R. approximately $16 to $40 per patient, including many Medicare beneficiaries, including Y.G., D.B., J.M., R.V. and B.T., referred to the 4M Pharmacies for diabetic testing supplies and other medications. In total, from July 2016 through August 2020, **MOKBEL** caused the payment of over $12 million in payments for patient personal information, including the BINs of Medicare beneficiaries, including Y.G., D.B., J.M., R.V. and B.T.

48.     To maximize reimbursements and without regard for medical necessity, **MOKBEL** then directed 4M employees to use the Medicare beneficiaries' BINs and other patient data to run insurance claims (referred to as "test claims"), to determine if Medicare or other insurance would cover and reimburse at a high rate for the topical creams, Omega-3 pills, and other medications that **MOKBEL** intended to sell through the 4M pharmacies.

49.     If  the "test claims" verified that a patient's insurance would reimburse for certain medications, 4M employees would then send pre-filled prescription requests by fax to the patients' doctors for diabetic testing supplies with the false representation that the patient was requesting a 4M Pharmacy fill their diabetic testing supplies or other medications. Topical creams and/or omega-3 pills were often listed below the diabetic testing supplies on the pre-filled prescription requests.  In reality, **MOKBEL** had previously purchased the patient's personal information,  the patient had not selected a 4M Pharmacy, and the patient was often unaware the request was being made on their behalf. Many doctors apparently took the representations in the fax at face value and did sign and send back the prefilled prescription requests to 4M.

### Use of Telemarketing in Furtherance of the Scheme
(18 U.S.C. § 2326)

50.     At **MOKBEL**'s direction, once 4M obtained a signed prescription under these false pretenses, 4M call center employees, often unlicensed sales representatives, would contact the patient by phone to obtain additional information such as the patient's current mailing address and market diabetic testing supplies and/or medically unnecessary topical creams and/or Omega-3 pills to patients.

51.     The 4M call center employees often represented to the patient that the patient's doctor had approved the specific medication. These statements were often misrepresentations because the doctor approvals were caused by earlier misrepresentations 4M made by fax requests

to the doctor's office claiming the patient had made a prescription request.

52.     Many times, the 4M Pharmacies misrepresented the cost of the medications to patients and told patients no copayment was owed, even though Medicare, Medicaid, and other private health care benefit programs, and the PBMs that administered them, required the 4M Pharmacies to collect copayments.

53.     Once filled, the 4M Pharmacies mailed the diabetic testing supplies, topical creams and/or Omega-3 pills to recipients all over the United States even though the 4M Pharmacies were enrolled with the PBMs as retail pharmacies, also known as community pharmacies, and not enrolled as mail order pharmacies.

54.     The PBMs occasionally audited or investigated the 4M Pharmacies.  At various times, **MOKBEL**, **ELSAFTY**, and others conspired to and did provide false information in response to these audits and investigations.

55.     From 2015 through 2020, **MOKBEL**, **ELSAFTY**, and others working at the direction of **MOKBEL** corruptly gave a series of bribe payments, ranging in amounts from $2,000 to $5,000, totaling over $155,000, to E.Y., an employee of a PBM, OptumRX. In exchange for these bribe payments, E.Y. arranged for favorable treatment of the many of the 4M Pharmacies by OptumRX. E.Y. arranged for many of the 4M Pharmacies to be credentialed and recredentialed with OptumRx, allowing them to enter into retail network agreements with OptumRx, participate in the Medicare Part D program, and submit claims for prescriptions for Medicare beneficiaries. E.Y. also provided information and advice to **MOKBEL** about responding to audits and preventing and/or delaying termination by OptumRX of many of the 4M Pharmacies.

56.     When a PBM terminated one of the 4M Pharmacies in or around 2017, **MOKBEL**, **ELSAFTY** and others conspired to buy and sell other 4M Pharmacies, using 4M employees and

associates, including **ELSAFTY**, C.H.,  and others, as straw owners, with the intent to deceive the PBMs to ensure that the 4M Pharmacies could continue billing Medicare, Medicaid, and private health care benefit programs for topical creams and Omega-3 pills.

57.     The 4M Pharmacies submitted claims electronically to Medicare, Medicaid, and private health care benefit programs, generally through PBMs, seeking reimbursement for topical creams, Omega-3 pills, and other drugs they purportedly dispensed.  Those health care benefit programs, including the PBMs, in turn, reimbursed the 4M Pharmacies' claims in reliance on representations that the drugs dispensed were medically necessary, provided as billed, based on legitimately obtained patients, based on validly obtained prescriptions, dispensed in compliance with the PBM contract, and that copayments were properly collected.

58.     Between in or around 2014 and in or around 2021, Medicare, Medicaid and private health care benefit programs paid the 4M Pharmacies, generally through the PBMs, approximately $140 million, mostly for topical creams, Omega-3 pills, and other drugs that were medically unnecessary, not provided, based on illegally purchased Medicare BINs and/or kickbacks, based on false representations to prescribers, patients, and/or the PBMs, and/or copayments were not properly collected.

59.     The proceeds were disbursed to the Defendants, their coconspirators, and others, and the Defendants each personally profited between hundreds of thousands of dollars and tens of millions of dollars from the scheme.

## COUNT ONE
## Conspiracy to Commit Mail Fraud and Health Care Fraud
## (18 U.S.C. § 1349)

60.     Paragraphs 1 through 43 of this Fourth Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

61.     Beginning no later than 2014 and continuing through in or around 2021, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

**MOHAMED M. MOKBEL;** and
**FATHY ELSAFTY**

did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly deliver and cause to be delivered, certain mail matter by the U.S. Postal Service and any private and commercial interstate carrier according to the directions thereon, in violation of Title 18, United States Code, Section 1341; and

b.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, and other government and private health care benefit programs, generally administered by PBMs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

13

## Object and Purpose of the Conspiracy

62.     The object and purpose of the conspiracy is described in Paragraph 44, and is realleged and incorporated by reference as though set forth fully herein.

## Manner and Means of the Conspiracy

63.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 45 through 59, and are realleged and incorporated by reference as though set forth fully herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
## Health Care Fraud
## (Violations of 18 U.S.C. §§ 1347 and 2)

64.     Paragraphs 1 through 62 are re-alleged and incorporated by reference as if fully set forth herein.

65.     Beginning in or around 2014 and continuing through in or around 2021, in the Houston Division of the Southern District of Texas and elsewhere, in connection with the delivery of, and payment for, health care benefits, items, and services, the Defendants did knowingly and willfully execute, and attempt to execute, the aforementioned scheme and artifice to defraud, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of a health care benefit program as defined in 18 U.S.C. § 24(b), that is, Medicare, Medicaid, and private health care benefit programs, generally administered by PBMs or Medicare drug plans.

66.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, submitted or caused

14

to be submitted the following false and fraudulent claims to the aforementioned health care benefit programs, for topical creams, Omega-3 pills, and other drugs that were often medically unnecessary, not provided, based on illegally purchased Medicare BINs and/or kickbacks, based on false representations to prescribers, patients, and/or the PBMs, and/or for which copayments were not properly collected, in an attempt to execute, and in execution of the aforementioned scheme, as described in Paragraphs 43 through 59, with each execution set forth below forming a separate count:

| Count | Defendant Charged | Approx. Date Claim Received | "Pt." | Pharmacy | PBM | Medication | Approx. Amount Paid |
|-------|-------------------|------------------------------|-------|----------|-----|------------|---------------------|
| 2 | MOKBEL | 9/26/2019 | Y.G. | Primary Care Pharmacy | CVS/ Caremark | Calcipotriene | $1,268.12 |
| 3 | MOKBEL | 9/26/2019 | D.B. | Fort Bend RX Pharmacy | CVS/ Caremark | Calcipotriene | $1,200.75 |
| 4 | MOKBEL ELSAFTY | 3/20/2019 | J.M. | One Choice Pharmacy | CVS/ Caremark | Calcipotriene | $324.99 |
| 5 | MOKBEL ELSAFTY | 4/9/2020 | R.V. | One Choice Pharmacy | OptumRX | Halobetasol | $254.81 |
| 6 | MOKBEL ELSAFTY | 2/11/2020 | B.T. | One Choice Pharmacy | OptumRX | Omega-3 pills | $346.39 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
**Conspiracy to Defraud the United States and to
Buy, Sell and Distribute BINs and to Pay Health Care Kickbacks**

15

**(Violations of 18 U.S.C. §§ 371 and 2)**

67.     Paragraphs 1 through 59 of this Fourth Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

68.     Beginning in or around 2016 and continuing through 2020, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

**MOHAMED M. MOKBEL**

did knowingly and willfully combine, conspire, confederate, and agree with G.R. and others known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, and to commit certain offenses against the United States, that is:

a.   to violate Title 42, United States Code, Section 1320a-7b(b)(4), by knowingly and willfully, without lawful authority, purchasing, selling, distributing, and arranging for the purchase, sale and distribution of beneficiary identification numbers under subsection XVIII, that is, BINs; and

b.   to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

**<u>Purpose of the Conspiracy</u>**

16

69.     It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by collecting, buying, selling, and distributing Medicare beneficiary information, including beneficiary names, dates of birth, social security numbers, BINs, among other things, and by paying kickbacks in exchange for the referral of Medicare beneficiaries for whom 4M Pharmacies submitted claims to Medicare.

### Manner and Means of the Conspiracy

70.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 45 through 59 are realleged and incorporated by reference as though set forth fully herein.

### Overt Acts

71.     In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Texas, at least one of the following overt acts, among others:

a.      On or about May 31, 2017, G.R. sent **MOHAMED M. MOKBEL** an email with a spreadsheet attached containing the BINs of numerous Medicare beneficiaries, including Y.G.

b.      On or about June 6, 2017, G.R. sent **MOHAMED M. MOKBEL** an email with two invoices requesting payment for "Marketing Services 5/31-6/5" from 4M for a total amount of $57,108. On or about June 12, 2017, 4M, at the direction of **MOHAMED M. MOKBEL**, sent a wire transfer for $57,108 to Company 1.

c.      On or about June 27, 2017, G.R. sent **MOHAMED M. MOKBEL** an email with a spreadsheet attached containing the BINs of numerous Medicare beneficiaries, including D.B.

d.      On or about June 28, 2017, G.R. sent **MOHAMED M. MOKBEL** and C.H. an email with two invoices requesting payment for "Marketing Services 6/21-6/27" from 4M for a total amount of $58,324.

e.      On or about July 17, 2017, G.R. sent **MOHAMED M. MOKBEL** and C.H more invoices for marketing services and stated, "we have a bunch of invoices open are thigs [sic] ok?" **MOHAMED M. MOKBEL** replied and stated "Yes everything is great , what is the bunch of invoices open? [sic]" G.R. replied that "[C.H.] had it under control…"

f.      On or about July 17, 2017, 4M, at the direction of **MOHAMED M. MOKBEL**, sent a wire transfer to Company 1 for $58,324.

g.      On or about December 8, 2017, G.R.'s employee sent  **MOHAMED M. MOKBEL** and other 4M associates an email with spreadsheets attached containing the BINs of numerous Medicare beneficiaries, including J.M.

h.      On or about December 11, 2017, G.R. sent **MOHAMED M. MOKBEL** and C.H. an email with two invoices requesting payment for "Marketing Services 12/6-12/11" from 4M for a total amount of $63,264. On or about December 11, 2017, 4M, at the direction of **MOHAMED M. MOKBEL**, sent a wire transfer for $66,544 to Company 1.

i.      Between 2017 and 2019, the 4M Pharmacies used the BINs of Y.G., D.B., and J.M. and submitted claims to Medicare through PBMs and/or Medicare drug plans for topical creams.

j.      On or about February 10, 2020, G.R. sent **MOHAMED M. MOKBEL** a contractual agreement and stated "please find attached the fixed price agreement that I spoke to you about that we need to go to…" The attachment included language that the parties would comply with the "Anti-Kickback Statute…42 U.S.C. § 1320a - 7a & 7b…"

18

k.      From on or about February 11, 2020 until on or about August 3, 2020, 4M, at the direction of **MOHAMED M. MOKBEL**, continued to pay Company 1 for "Marketing Services" and "Diabetic Marketing Services" per patient referred to the 4M Pharmacies.

All in violation of Title 18, United States Code, Section 371.

<u>**COUNTS 8 TO 14**</u>
**Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity**
**(Violations of 18 U.S.C. §§ 1957 and 2)**

72.      Paragraphs 1 through 59 of this Fourth Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

73.      On or about the dates specified below, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant

**MOHAMED M. MOKBEL**

aided and abetted by others, known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Commit Mail Fraud and Health Care Fraud, in violation of 18 U.S.C. § 1349, as follows:

| Count | Approx. Date | Transaction | Approx. Amount |
|---|---|---|---|
| **8** | 9/11/17 | Purchase of Cashier's Check in the amount of $564,208.54 from Allegiance Bank Account *8791 made payable to Republic National Title Insurance | $564,208.54 |
| **9** | 3/2/18 | Wire Transfer from Primary Care Pharmacy, LLC Allegiance Bank Account *1220 to Red Rock Casino Resort and Spa | $125,000 |
| **10** | 4/10/18 | Wire Transfer from Pharmacare Plus Pharmacy Bank Account *2004 at Allegiance Bank to Aria Casino Resort | $125,000 |

| 11 | 3/1/19 | Purchase of a Certificate of Deposit from Allegiance Bank Account *2026 in the name of Distinguished Pharmacy | $2,500,000 |
| 12 | 3/1/19 | Purchase of a Certificate of Deposit from Allegiance Bank Account *5903 in the name of Mace RX Pharmacy | $2,000,000 |
| 13 | 3/4/19 | Purchase of a Certificate of Deposit from Allegiance Bank Account *1220 in the name of Primary Care Pharmacy, LLC | $840,000 |
| 14 | 3/4/19 | Purchase of a Certificate of Deposit from Allegiance Bank Account *6246 in the name of Primary Care Pharmacy, LLC | $660,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT 15
**Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds**
**(Violations of 18 U.S.C. §§ 371 and 2)**

74.    Paragraphs 1 through 59 of this Fourth Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

75.    At all times material to this indictment, OptumRX, a Pharmacy Benefits Manager, located in Irvine, California, was an organization that received federal assistance in excess of $10,000 during each of the years 2015 to 2020.

76.    At all times material to this indictment E.Y. was an employee and agent of OptumRX, whose duties included credentialing and recredentialing pharmacies. Credentialed pharmacies were able to enter into retail network agreements with OptumRX and participate in the Medicare Part D program, which the federal government subsidized the costs of prescription drugs for Medicare beneficiaries.

77.    Beginning in or around 2015 and continuing through 2020, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

**MOHAMED M. MOKBEL;** and
**FATHY ELSAFTY**

20

did knowingly and willfully combine, conspire, confederate, and agree with each other, E.Y. and others known and unknown to the Grand Jury, to commit certain offenses against the United States, including bribery concerning programs receiving federal funds, that is, to corruptly give, offer, and agree to give one or more things of value to E.Y. intending to influence and reward E.Y. in connection with a transaction and series of transactions of OptumRX involving $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(2)

## Purpose of the Conspiracy

78.     The purpose of the conspiracy was for the Defendants and their co-conspirators to pay bribes to E.Y. in exchange for favorable treatment of the 4M Pharmacies by OptumRX enabling the 4M pharmacies to bill OptumRX when filling the prescriptions of Medicare beneficiaries.

## Manner and Means of the Conspiracy

79.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 45 through 59 are realleged and incorporated by reference as though set forth fully herein.

## Overt Acts

80.     In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Texas, at least one of the following overt acts, among others:

a.     Between 2015 and 2020, E.Y. and **MOKBEL** communicated frequently by text message and email about the 4M Pharmacies and the payment of bribes to E.Y. E.Y. and **MOKBEL** frequently refer to the bribe payments to E.Y. as "cake" or other desserts.

b.      On February 10, 2016, E.Y. emailed **MOKBEL** about signing Family Pharmacy's credentialing agreement and states that "[o]nce this is complete, I'll expedite the implantation of this Agreement." E.Y. also mentions that his "Wells Fargo acct is overdrawn…" **MOKBEL** responds, "No problem got it."

c.      On March 28, 2016, **ELSAFTY** issued a check from his business, Advanced Business & Tax Services, to E.Y. in the amount of $5,000. On March 30, 2016, Family Pharmacy entered the OptumRX retail network.

d.      On October 6, 2017, E.Y. emailed **MOKBEL** that he "convinced our Director to reinstate [Family] pharmacy yesterday." E.Y. asked **MOKBEL** "when should I expect my cake, brother???????"

e.      On November 3, 2018, E.Y. text messaged **MOKBEL** that "we have to take action regarding Family Pharmacy…Have [to] request an appeal hearing. CALL ME". On November 9, 2018, E.Y. text messaged **MOKBEL** "Appeal letter received. Cake?"

f.      On November 9, 2018, a 4M employee, M.E., issued a check to E.Y. in the amount of $3,000.

g.      On October 2, 2018, **MOKBEL** text messaged E.Y. asking "why you guys disconnect my pharmacy without notice". E.Y. asked which pharmacy. **MOKBEL** responded "Fort bend pharmacy." E.Y. agreed to look into the problem. On October 4, 2018, E.Y. said "should be able [to] process tomorrow." **MOKBEL** responded "K perfect bro you will have strawberry chocolate tomorrow."

h.      On October 5, 2018, a 4M employee, M.E., issued a check to E.Y. in the amount of $5,000. On October 6, 2018, E.Y. text messaged **MOKBEL** "Cake and ice cream received. Delicious!"

i.      On February 18, 2020, E.Y. text messaged **MOKBEL** to sign the "Credentialing App and Pharmacy Network Agreement" for Grand RX and that E.Y. will "fast track it and get the pharmacy contracted right away."  On March 4, 2020, E.Y. asked **MOKBEL** if it had been "Sent?" **MOKBEL** responded "Yes". On March 5, 2020, E.Y. told **MOKBEL** that he "Made some changes to app. Call me."

j.      On March 6, 2020, a 4M employee, M.E., issued a check to E.Y. in the amount of $3,000. E.Y. text messaged **MOKBEL** "THANK YOU BROTHER."

k.      On March 17, 2020, E.Y. text messaged **MOKBEL** that he is waiting on the "last step in the getting the contract implemented." Later that day, E..Y. text messaged **MOKBEL** "Added bro. Effective 3/12/20". **MOKBEL** responded "Ok bro thank you".

l.      On March 20, 2020, E.Y. text messaged **MOKBEL** "No cake yet". **MOKBEL** responded "You having it in very few bro".

m.      On March 20, 2020, **MOKBEL** issued a check from 4M to E.Y. in the amount of $3,000.

n.      On June 18, 2020, E.Y. text messaged **MOKBEL** that One Choice Pharmacy was about to be terminated "tomorrow" if the pharmacy did not appeal. E.Y. told **MOKBEL** to draft a letter, "stating that the pharmacy would like to request an appeal of the termination of One  Choice Pharmacy. That's all you have to do." The next day **MOKBEL** told E.Y. that he sent the letter off.

o.      On June 22, 2020, **MOKBEL** issued a check to E.Y. from 4M in the amount of $3,000.

All in violation of Title 18, United States Code, Section 371.

23

## COUNT 16
### Bribery Concerning Programs Receiving Federal Funds
### (Violations of 18 U.S.C. §§ 666(a)(2) and 2)

81.     Paragraphs 1 through 59 and 74 through 76 of this Fourth Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

82.     From in or about February 2020, up to and including March 2020, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant

### MOHAMED M. MOKBEL

aided and abetted by others, known and unknown to the Grand Jury, did corruptly give, offer, and agree to give a thing of value, that is two checks totaling $6,000, to any person intending to influence and reward E.Y. in connection with a transaction and series of transactions of OptumRX involving $5,000 or more, that is the credentialing of Grand RX Pharmacy with OptumRX and participation in the Medicare Part D program, which the federal government subsidized the costs of prescription drugs for Medicare beneficiaries.

All in violation of Title 18, United States Code, Sections 666 and 2.

### NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(a)(7))

83.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice that upon a defendant's conviction of Counts One through Seven, and Counts Fifteen through Sixteen, all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses is subject to forfeiture.

84.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a defendant's conviction of Counts One through Seven, and Counts Fifteen through Sixteen, all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses is subject to forfeiture.

85.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice that upon a defendant's conviction of Counts Eight through Fourteen, all property, real or personal, involved in money laundering offenses or traceable to such property is subject to forfeiture.

### Property Subject to Forfeiture

86.     The property subject to forfeiture includes, but is not limited to, the following property:

> a.      Real Property on Devon Street, Houston, Texas, together with all improvements, buildings, structures, and appurtenances, and legally described as follows:
>
> > Lot Ten (10), in Block Eight (8), of AFTON OAKS SECTION NO. 2, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 38, Page 33 of the Map Records of Harris County, Texas.
>
> b.      $3,143,473.97 seized from Regions Bank account held in the name of 4M Pharmaceuticals, LLC, with an account number ending in 4137.
>
> c.      Prepaid stored value cards seized from the residence of Defendant **MOHAMED M. MOKBEL**.

**Money Judgment and Substitute Assets**

87.     The United States gives notice that it will seek a money judgment against each

defendant. If one or more conditions listed in Title 21, United States Code, Section 853(p) exist,

the United States will seek to forfeit any other property of each defendant up to the amount of the

money judgment against that defendant.


ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY


*Kathryn Olson*
KATHRYN OLSON
ADAM LAURENCE GOLDMAN
ASSISTANT UNITED STATES ATTORNEYS
U.S. ATTORNEY'S OFFICE FOR
THE SOUTHERN DISTRICT OF TEXAS